IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Case No. 1:05-cr-139 |
| Plaintiff, | : | |
| | : | District Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER DENYING |
| LEIF D. ROZIN, et al., | : | DEFENDANTS ROZIN'S & |
| | : | KALLICK'S MOTION IN |
| Defendants | : | LIMINE TO PRECLUDE THE |
| | : | TESTIMONY OR STATEMENTS |
| | : | OF ALAN W. KOEHLER; IN |
| | : | THE ALTERNATIVE, TO |
| | : | DISMISS THE INDICTMENT, |
| | : | DUE TO VIOLATION OF |
| | : | DEFENDANTS' |
| | : | ATTORNEY/CLIENT |
| | : | PRIVILEGE |

This matter comes before the Court on Defendants Rozin's and Kallick's Motion In Limine to Preclude the Testimony or Statements of Alan W. Koehler; In the Alternative to Dismiss the Indictment, Due to Violation of Defendants' Attorney/Client Privilege. (Doc. 63 and responsive docs. 77, 86, 88, 91.)[1]  For the reasons that follow, the Court **DENIES** Defendants' motion in limine.

---

[1] The Court held a hearing on the above motions on May 14, 2007, at which time the Court heard arguments and received evidence. The motions are now fully briefed and are ready for review.

**I.	BACKGROUND**

Defendants Alan Koehler, Leif D. Rozin, Bruce Cohen, Burton Kallick, and Milton Liss are charged with various counts of conspiracy to defraud the United States and impede and impair the Internal Revenue Service ("IRS") in violation of 18 U.S.C. § 371 (Count 1), subscribing a false tax return in violation of 26 U.S.C. § 7206(1) (Count 2), aiding and assisting in the preparation and filing of a false tax return in violation of 26 U.S.C. § 7206(1) (Counts 3-5), and attempted tax evasion in violation of 26 U.S.C. § 7201 (Counts 6 and 7).  (See Indictment, doc. 1.)  Rozin is charged under Counts 1, 2, and 6; Kallick was charged under Counts 1, 3, and 7, but has since been dismissed from the suit due to his death; and Koehler, Cohen, and Liss are charged under Counts 1, 3, 4, and 5.

In or around 2000, the Government began investigating the business dealings of Rozin, Inc., of which Leif D. Rozin and Burton Kallick were co-owners.  The Government initially suspected that Rozin and Kallick had received kickbacks that they had failed to report to the Internal Revenue Service ("IRS"), but it quickly shifted the focus of its investigation to the nature of an unusually large insurance deduction that appeared on Rozin, Inc.'s corporate tax return for the year 1998.  The investigation of Rozin and Kallick eventually led the Government to suspect wrongdoing by Defendants Milton Liss and Bruce Cohen, the licensed insurance agents who advised and eventually established various loss of income ("LOI") insurance plans for Rozin and Kallick.  Finally, the Government learned that Defendant Alan Koehler, who served as in-house counsel for Rozin, Inc., may have been involved in an alleged conspiracy to defraud the IRS.

Over the course of the approximately five-year investigation, the Government had several meetings with Koehler. In 2000, shortly after identifying Koehler as an employee of Rozin, Inc., the Government issued an administrative summons requesting an interview with Koehler. On October 2, 2000, Koehler met with IRS Special Agents Douglas Ryan and Kevin Ollendick. An IRS Revenue Agent, Steve Rowe, was also present. Martin Horwitz, who was at that time acting as counsel for Defendant Rozin, accompanied Koehler to the meeting. (Tr. 121:1-2.)[2] The agents did not, at that time, consider Koehler to be a subject of the investigation. (See Summary of Administrative Summonses Issued, doc. 111 Ex. 11 (stating the reason for summonsing Koehler to be that he was the "Rozin, Inc. Attorney" in contrast to the stated reason for summonsing Rozin and Kallick, describing each as a "Subject of the Investigation").) Instead, as the agents told Koehler, the IRS was investigating "the tax liability of Leif Rozin and Burton Kallick for tax years 1995, 1996, 1997 and 1998." (Doc. 57 at 2 and Ex. A ¶ 2.)

The agents interviewed Koehler for approximately two hours. The memorandum of interview prepared by Agent Ollendick and signed by both Agents Ryan and Ollendick, indicates that Koehler provided information about his educational and professional background, his role at Rozin, Inc., and the general business practices of the company. (See doc. 57 Ex. A.) Koehler stated that he had never prepared any tax returns for Rozin, Inc. or for Defendants Rozin or Kallick. With regard to the insurance policies at issue in this case, Koehler stated that "in late 1998 Rozin, Inc. purchased two non-renewable 'loss of income' [LOI] insurance policies," and

---

[2] The transcript of the evidentiary hearing held on Defendants' motion was electronically filed and appears at ECF Doc. Nos. 114-116.

attributed the large deduction on the 1998 tax return to the purchase of those policies.  (See doc. 57 Ex. A ¶ 20.)

Horwitz was present during the entire interview and at no time stated that he had any objection to the agents' line of questioning.  (Tr. 121:3-11, 123:4-15, 342.)  Nor did Horwitz attempt to limit the parameters of the interview.  (Id.)

The Government did not seek another interview with Koehler until approximately a year and a half later, on September 11, 2002, after serving him with a grand jury subpoena.  According to Defendant Rozin, neither he nor Kallick nor their counsel was aware of this or any subsequent meeting between Defendant Koehler and the Government.  Similar to the previous meeting, on September 11, 2002, Koehler once again met with the Special Agents Ryan and Ollendick for approximately two hours.  By that time, Koehler was no longer working as in-house counsel for Rozin, Inc.  Additionally, the agents had uncovered more information indicating that Koehler was directly involved with the purchase of the LOI insurance policies and had accompanied Rozin and Cohen to the Virgin Islands for the purpose of setting up the policies.  The agents had also obtained evidence that Koehler was a named insured of one of the policies.  Finally, the agents had learned that Koehler was possibly assisting in selling similar policies to others and had received income from Liss's company, Signature Associates, Inc.

The agents informed Koehler that they "were conducting an investigation on behalf of a federal grand jury in Cincinnati, Ohio and that the investigation related to the tax liability of Leif Rozin and Burton Kallick."  (Doc. 57 Ex. B. ¶ 1.)  When asked why he had received income from Signature Associates, Inc., Koehler told the agents that he had received a commission from Liss on the LOI policies sold to Rozin and Kallick, but the agents believed that any commission

Koehler may have earned from that sale would have been too small to account for the entire $64,000 payment he received from Liss. The agents also asked Koehler about the nature of a $625,000 check payable to Signature Associates, Inc. Koehler told the agents that this check represented a payment on the premium for the LOI policies and that "the money used to purchase the LOI policies came from a Key Bank checking account controlled by Rozin, Inc." (Id. Ex. B ¶ 5.)

Again, Koehler raised no objection to the agents' questions. (Tr. 131:18-19.) Nor did he assert attorney-client privilege or indicate that any of the information he provided was privileged, despite being informed of the nature of the interview. (Id. at 131:12-17.)

Because of Defendant Koehler's suspected role in the LOI scheme, Agents Ryan and Ollendick were concerned that Koehler had perhaps provided an opinion as an attorney regarding the actions Rozin and Kallick took in deducting the LOI policies on the Rozin, Inc. corporate tax return which in turn flowed through to their individual tax returns. (Tr. 140:20-21.) Accordingly, during a phone conversation that took place on October 28, 2002, the agents asked Koehler whether he had ever provided such advice. (Id.) According to Agent Ryan, Koehler said "that he did not render a legal opinion as it related to the purchase of the loss of income policies; that his job was basically to process and review legal paperwork as how he described it." (Id. at 141:3-7.)

The following year, on June 5, 2003, Koehler met with the special agents for a third time. At that meeting, Koehler was served with a subpoena requiring him to appear before a grand jury on July 9, 2003, which appearance was ultimately cancelled by the Government. Along with the subpoena, the agents also gave Koehler an immunity agreement, which Koehler executed. (See

id. Ex. D.) During the June 5 interview, which lasted approximately three hours, Koehler again claimed that Rozin, Inc. had purchased a second set of LOI policies in December 1998, though he stated he was unaware of how Rozin, Inc. paid for the policies. Koehler and the agents also discussed Scotch Holdings, an entity established on behalf of Kallick and Rozin. The agents questioned Koehler about several payments that were made to a foreign bank account, but Koehler expressed no knowledge of those payments. Nor could Koehler recall anymore details about the $64,000 he had received from Signature Associates, other than those he had already disclosed. The agents also asked Koehler about a product known as Basis Boost. Koehler told the agents that Basis Boost was a product that Defendants Cohen and Liss were selling, and that it could be used to negate any capital gains derived from the sale of stock. He did not disclose that Rozin and Kallick had negotiated with Cohen to purchase Basis Boost, that they had paid for the Basis Boost product, or that he had apparently made money from the sale of the product to Rozin and Kallick.

     The Government did not seek to interview Koehler again until October 7, 2004. At that time, Koehler submitted to another interview lasting approximately three hours. Along with Agents Ryan and Ollendick, Department of Justice Attorney Richard Rolwing was also present at that interview. During this interview, Koehler made many of the same statements he made during the 2003 interview. However, around this same time, the IRS agents uncovered more evidence regarding Koehler's role in the Basis Boost scheme and had begun to suspect that Koehler was not being entirely honest. Specifically, in 2004, the Government received additional evidence about Basis Boost from Milton Liss, including evidence leading the special agents to believe that the $625,000 check from Rozin, Inc. to Signature Associates was

6

originally intended as payment for Basis Boost rather than for the LOI policies.  The Government also learned from Defendants Cohen and Liss that the Basis Boost deal fell through in June 1999.  At that time, allegedly, Defendants decided to use the $625,000 paid to Signature Associates to purchase LOI policies for Rozin, Inc.  Further evidence suggested that Defendants had backdated the LOI policies so that Rozin, Inc. could claim them as a deduction on its corporate income tax return for 1998.  Finally, the Government also discovered that Koehler had been selling Basis Boost for Defendant Liss on a commission basis.

The final series of conversations the Government had with Koehler during its investigation occurred via a series of telephone calls on July 18, 19, and 20, 2005.  During those calls, which appear to have been relatively short, DOJ Attorney Rolwing informed Koehler that the Government was withdrawing the agreed-upon immunity and advised Koehler to retain legal counsel.

Arguing that the Government's interviews and conversations with Koehler violated his attorney-client privilege, Defendant Rozin[3] now seeks an order prohibiting the Government from offering the testimony of Koehler or any evidence derived from Koehler's pretrial-interviews.  In addition, Rozin moves the Court to dismiss his indictment on the ground that the Government inappropriately sought confidential information from Koehler in violation of Rozin's rights and then used this allegedly privileged information to seek an indictment from the grand jury.  Rozin also seeks disclosure of the Government agents' grand jury testimony so that he may evaluate the extent to which the grand jury relied upon privileged information in returning an indictment.

---

[3] Because Kallick passed away during the pendency of this suit, the Court considers Defendants' jointly-filed motion in limine only to the extent it pertains to Defendant Rozin.

**II. LEGAL STANDARD**

"The burden of establishing the existence of the [attorney-client] privilege rests with the person asserting it." United States v. Dakota, 188 F.3d 663, 667 (6th Cir. 1999). The Sixth Circuit has articulated the following test for determining whether a communication is privileged: "(1) where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection is waived." Reed v. Baxter, 134 F.3d 351, 355-56 (6th Cir. 1998). The attorney-client privilege is construed narrowly in the context of an IRS investigation "given the 'congressional policy choice in favor of disclosure of all information relevant to a legitimate IRS inquiry.' " Cavallaro v. United States, 284 F.3d 236, 245 (1st Cir. 2002), quoting United States v. Arthur Young & Co., 465 U.S. 805, 816 (1984).

**III. ANALYSIS**

**A. Dismissal of Indictment**

Under certain circumstances, courts may exercise their supervisory power to dismiss a grand jury indictment. United States v. Streebing, 987 F.2d 368, 372-73 (6th Cir. 1993). This power is "premised on the inherent ability of the federal courts to formulate procedural rules not specifically required by the Constitution or Congress to supervise the administration of justice." Id. Courts have, in the past, exercised such power in situations where there has been an outrageous governmental intrusion into the attorney-client privilege. See United States v. Valencia, 541 F.2d 618 (6th Cir. 1976). However, while a court may use its supervisory power

to dismiss an indictment, dismissal is, generally speaking, a disfavored remedy. United States v. Rogers, 751 F.2d 1074 (9th Cir. 1985). In United States v. Smith, 687 F.2d 147 (6th Cir. 1982), the Sixth Circuit held that "[i]n order for this court to order dismissal of an indictment as part of its supervisory powers, there must be a showing of 'demonstrated and longstanding prosecutorial misconduct' as well as a showing of substantial 'prejudice to the defendant.' " Id. at 152-53.

Rozin argues that the Government's conduct in this case, specifically the repeated intrusion into his attorney client privilege, was precisely the type of conduct that warrants dismissal of the indictment. Rozin relies on two cases, both of which involved the violation of a criminal defendant's attorney client privilege. In the first case, United States v. Omni Int. Corp., 634 F. Supp. 1414 (D. Md. 1986), a corporate defendant along with several related individual defendants, including the corporation's attorney, were charged with several counts of tax evasion and conspiracy to defraud the IRS. Id. at 1416. The defendants moved to dismiss the indictment, claiming that an Assistant United States Attorney and two IRS agents had intentionally set out to breach the attorney-client privilege and later attempted to conceal their actions. Id.

In Omni, the government had been investigating the defendant company for several years prior to the return of an indictment. As the government's case took shape, the defendant company at one point asserted attorney-client privilege with regard to Joseph Bornstein, who had served as the company's outside counsel and tax advisor. The court found that from that point on, the defendant company asserted its privilege "vigorously." Id. at 1418. Following the assertion of privilege, the government continued to attempt to speak with Bornstein, causing Bornstein to file an application with the Court for an order permitting a proffer to the

government.  The other defendants intervened and challenged Bornstein's application.  The court ultimately allowed the proffer but with limitations, including a requirement that certain documents be submitted for in camera inspection.  In the meantime, the government continued to attempt to circumvent the attorney client privilege by interviewing numerous other attorneys who had represented the defendant and by interviewing Bornstein's former secretary regarding privileged matters.  Id. at 1417-19.

Citing this conduct, the defendants moved to dismiss the indictment against them on the basis that the government had intentionally and continually intruded upon their attorney-client privilege.  Ultimately, the court denied the motion to dismiss, noting that "[i]t is doubtful whether, in any event, dismissal of the indictment would be appropriate for breaches of the attorney-client privilege, no matter how flagrant the intrusion."  Id. at 1421.  The court found that the defendants failed to meet their burden of showing that the government had violated the attorney-client privilege.  As to Bornstein's proffer, the court recognized that this resulted in the disclosure of privileged material but held that it was not improper as the proffer was expressly approved by the court and the information obtained by the proffer could not be used against Omni in court.  Id. at 1422.  Turning next to the agent's attempts to access privileged information through Bornstein's former secretary, the court criticized the agent's actions but found that the defendants failed to show that the information obtained from the secretary was actually privileged.  Finally, the court found that the agents did not act improperly in interviewing former Omni attorneys.  Id. at 1422-23.

Rozin claims that Omni is instructive because it demonstrates that the proper procedure in this case would have been to apply for a proffer.  According to Rozin, the actions of the IRS

10

agents and Attorney Rolwing in the instant case were much worse than those of the agents in Omni because in this case, Koehler "surreptitiously met with the Government agents and made privileged disclosures," leaving Defendants Rozin and Kallick no opportunity to intervene. Even assuming that Rozin can ultimately prove that the Government obtained privileged materials from Koehler, Rozin's reliance on Omni to justify dismissal of the indictment is misplaced for several reasons. First, the failure of Koehler to seek to protect allegedly privileged information by refusing to speak with the Government prior to filing an application for a proffer cannot be attributed to the Government. This principle is perhaps stated best by the Omni court in connection with the court's finding that the government agents' attempts to interview former Omni attorneys was not misconduct:

> Attorneys are cognizant of the limits of the privilege. Attorneys are better informed than investigating agents on the applicable law and particular facts presented to them to make judgments about compliance with the attorney-client privilege. Attorneys will not readily disclose confidential communications. This Court is confident that attorneys possess the ability to defend vigorously their clients' interests, even when interviewed by government agents. Therefore, when the agents asked a former Omni attorney questions in the form of hypotheticals, as opposed to direct issues, the attorney was fully capable of protecting any privileged information and would have declined to answer the hypotheticals if an answer would have violated the privilege. The agents may have set out to breach the privilege, by asking the attorney about advice he gave his client, but it then becomes incumbent on the attorney either to refuse to discuss the matter in an interview or to testify before the grand jury, or to risk a civil suit against him for revealing confidential communications.

Omni Int. Corp., 634 F. Supp. at 1422-23 (internal citations omitted).

Second, the Court rejects Rozin's assertion that the agent's actions in this case were more egregious than the actions of the agents in Omni. There was no clear, let alone "vigorous," assertion of the attorney-client privilege in this case. Agent Ryan testified that the general practice when interviewing a subject who raises the attorney-client privilege is to stop the

11

interview and ascertain the nature of the information the subject claims to be privileged.  In this case, there is no evidence that the IRS agents had reason to believe the information they questioned Koehler about was privileged.  Koehler never raised the privilege himself.  Nor did he indicate that Rozin or Kallick retained him to represent them in a personal capacity or sought legal advice from him with respect to the purchase of the Basis Boost product, the LOI policies, or the related tax deductions.  To the contrary, as Agent Ryan recounted at the evidentiary hearing, Koehler repeatedly denied having ever represented Rozin and Kallick in their individual capacity with regard to the filing of their 1998 tax returns or as to the purchase of the LOI policies.

Arguing that the attorney-client privilege belongs to the client and not to the attorney, Rozin contends that Koehler's failure to raise the privilege was immaterial.  Rozin claims that had he known the Government was interviewing Koehler, he would have asserted the privilege.  According to Rozin, the Government intentionally sought to prevent Rozin and Kallick from asserting privilege by instructing Koehler not to disclose the existence of the grand jury subpoena in 2004 and by failing to notify Rozin and Kallick prior to each interview with Koehler.  However, as discussed below in Section III.B of this Order, Rozin and his counsel in fact possessed prior knowledge that the Government had interviewed Koehler and was interested in his knowledge on the matters under investigation.  Accordingly, Rozin cannot now claim that he was denied a reasonable opportunity to assert his privilege.

Rozin next contends that he raised the privilege in 2004, but that the Government continued to interview Koehler.  Specifically, Rozin alleges that during a June 30, 2004 phone conversation with DOJ Attorney Richard Rolwing, after learning that Koehler might become a

grand jury witness, Rozin's counsel, Attorney LaSpada, advised Rolwing of an attorney-client privilege between Rozin and Koehler and objected to the Government making any further contact with Koehler in violation of Rozin's privilege. However, the Government denies Rozin ever making such an express assertion of privilege and the only purported record of the phone call is a letter from Attorney Horwitz to Rolwing dated July 7, 2004. (See doc. 63 Ex. C.) The letter references a conversation between Attorneys Rolwing and LaSpada that occurred the previous week and states, "If you call Alan Kohler[sic] as a Grand Jury witness, we would like to discuss the areas of inquiry with you. As you know, he is an attorney and we want to resolve these so that he can give you complete testimony on the issues of this case." (Id.) This letter in no way represents a clear assertion of attorney-client privilege, nor does it indicate that Rozin and Kallick believed the alleged privilege to attach to them, personally, with regard to the purchase of the LOI policies and the related tax deduction. Moreover, there simply is no evidence that the Government sought to intentionally circumvent an asserted privilege in this case. Accordingly, Omni does not help Defendant's position.

Rozin next relies on United States v. Valencia, 541 F.2d 618 (6th Cir. 1976). That case is similarly distinguishable in that it involves the government's attempts to gain privileged information from an attorney representing the defendant as to his criminal defense by recruiting the attorney's secretary as an informant. See id. The Government in the instant case did not engage in such "spying business." See id. at 621. As indicated above, the Government had little if any basis to suspect it was intruding into the Defendants' attorney-client privilege. See also, United States v. Rogers, 751 F.2d 1074, 1077-78, 1080 (9th Cir. 1985) (recognizing the distinction between: (1) interviewing an attorney who is a potential witness and an attorney who

13

is in the process of representing a client in a criminal matter; and (2) cases involving surreptitious eavesdropping through the use of an informant and cases in which an IRS agent speaks openly with an attorney about the nature of the investigation and identifies himself as an agent).

Indeed, this case is very similar to Rogers, 751 F.2d at 1074, in which the Ninth Circuit, addressing the specific nature of the attorney-client privilege as it arises in the context of an IRS investigation, reversed the dismissal of an indictment based on allegations similar to those raised by Defendant Rozin.  In Rogers, an IRS agent investigating the defendant, Rogers, contacted one of Rogers' former attorneys regarding Rogers' participation in the sales of a tax shelter.  The former attorney talked to the IRS agent on two separate occasions and provided a sworn statement denying involvement in the tax shelter and claiming that he did not provide any legal opinion as to the shelter.  Id. at 1075-76.

In holding that the IRS agent's contact with Rogers' former attorney was not so outrageous as to justify dismissal of the indictment, the Ninth Circuit noted that situations in which an attorney who is a potential witness talks to federal agents about past representation of a client at most involve a breach of the attorney's ethical obligation of confidentiality, which may require suppression of the privileged information, but would not warrant dismissal of the indictment.  Id. at 1077-78.  With regard to the issue of prejudice, the court found that the use of privileged information during the investigatory period does not amount to the type of prejudice that would warrant dismissal of an indictment:

> The fact that the Miller disclosures might have encouraged the IRS to continue its
> investigation of Rogers and, ultimately, to seek an indictment does not justify
> dismissing the indictment. The prejudice relates only to the investigatory stage
> and does not affect Rogers's ability to defend himself at trial. There is a

>fundamental distinction between the use of privileged information at trial, and its use during the investigatory period. See United States v. Calandra, 414 U.S. 338, 349 (1974) ("Because the grand jury does not finally adjudicate guilt or innocence, it has traditionally been allowed to pursue its investigative and accusatorial functions unimpeded by the evidentiary and procedural restrictions applicable to a criminal trial.").

Id. at 1079. Similarly, Defendant Rozin has not shown that any potential prejudice that may stem from the Government's contacts with Koehler could not be cured by the suppression of any evidence proven to be privileged. Accordingly, Defendant Rozin's motions to dismiss the indictment and for disclosure of the agents' grand jury testimony are denied.

**B.     Suppression of Privileged Evidence**

Neither has Defendant Rozin shown, at this point, that any evidence should be suppressed on the basis of attorney-client privilege. Rozin simply failed to meet his burden in demonstrating the existence of an attorney-client privilege between him and Koehler. While the Government admits that Koehler stated to the IRS agents at some point that he had done some personal work for Rozin and Kallick, there is no indication that Koehler ever identified the nature of these personal matters. (See doc. 77 at 9 and Ex. 2; doc. 86.) In any case, as stated previously in this order, Rozin presented no evidence that he ever retained Koehler for representation or sought legal advice from Koehler with respect to the attempted purchase of the Basis Boost product, the purchase of the LOI policies, or the related tax deduction. To the contrary, the evidence suggests that Koehler was acting not as an attorney with respect to the sale of the Basis Boost product and the LOI policies, but rather as an interested party to the venture who stood to earn commissions off these sales. In fact, the evidence indicates that Koehler was actively marketing Basis Boost for Defendant Liss in return for such commissions.

Moreover, to the extent that any of the information Koehler disclosed actually was privileged, Rozin fails to demonstrate that the Government's discussions with Koehler on these matters violated that privilege.  First, the Government, in the course of an IRS investigation, may seek to discover whether the target of a criminal tax investigation relied on advice of counsel or whether the attorney, himself, was involved in any illegal activity concerning the practices under investigation.  See Rogers, 751 F.2d at 1080 ("Moreover, Taylor could properly inquire as to whether Miller, himself, was involved in any illegal activity concerning the tax shelter. Miller's possible complicity in criminal fraud would not be immunized because he was an attorney giving advice to a client. Furthermore, the ethical obligation of confidentiality would not extend to any communication furthering illegal activity. Miller had a right to respond in defense of his questioned participation in any illegal tax shelter promotions." (internal citations omitted)).

Second, the Court finds that Rozin implicitly waived any attorney-client privilege with respect to Koehler by failing to raise this privilege during the October 2000 interview or sometime shortly thereafter.  Rozin and his counsel knew as early as that interview, if not earlier, that the Government was asking Koehler questions about the 1998 tax return, the LOI policies, and Koehler's role in representing Rozin, Inc.  Rozin had ample opportunity to raise the privilege at that point but failed to do so.  Indeed, as stated previously in this Order, counsel for Rozin sat in on the entire October 2, 2000 interview, yet raised no privilege or objection as to the agents' questions.  At least as of that point, Defendant was on notice that the Government was investigating the tax liability of Rozin, Inc. and the nature of the LOI policies and the related tax deduction.  As the Government had already begun to express interest in Koehler's knowledge on these matters, it would have required no stretch of imagination to suspect that the IRS agents

16

may want to follow up with additional interviews as their investigation progressed. The Court therefore denies Rozin's motion to suppress evidence obtained from the Government's conversations with Koehler.

## VI. CONCLUSION

For the reasons stated above, the Court **DENIES** Defendants' motion in limine.

IT IS SO ORDERED.

                                                                   s/Susan J. Dlott
                                                                   Susan J. Dlott
                                                                   United States District Judge